# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 11, 2001Session

## STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v. LaSHONDRA WHALEY

**Appeal from the Juvenile Court for Bradley County**
**No. 7205-J   C. Van Deacon, Judge**

### FILED MAY 30, 2002

### No. E2001-00765-COA-R3-CV

This appeal from the Juvenile Court of Bradley County questions whether the Trial Court erred in terminating the parental rights of Ms. Whaley. We reverse the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and CHARLES D. SUSANO, JR., JJ., joined.

Debra L. House, Cleveland, Tennessee, for the Appellant, LaShondra Whaley.

Paul G. Summers, Attorney General & Reporter, and Dianne Stamey Dycus, Deputy Attorney General, Nashville, Tennessee, for the Appellee, State of Tennessee Department of Children's Services.

### OPINION

This is an appeal from Bradley County Juvenile Court whereby Ms. Whaley appeals the decision of the Trial Court to terminate her parental rights and presents for our review four issues which we restate:

> I.  Whether there is clear and convincing evidence that Ms. Whaley's parental rights should be terminated.
>
> II.  Whether LaShondra Whaley is mentally incompetent, pursuant to T.C.A. 36-1-113(G)(8), so as to prevent her from parenting her minor child.

III.	Whether the Tennessee Department of Children's Services made reasonable efforts for the minor child to return home as required by T.C.A. 37-1-166.

IV.	Whether termination of Ms. Whaley's parental rights is in the best interest of the minor child as set forth in T.C.A. 36-1-113.

We reverse the decision of the Trial Court and remand for such further proceedings, as may be necessary, consistent with this opinion.

This appeal concerns Ms. Whaley and her son, J.W, who was born on December 17, 1995. From the time of his birth to the present, J.W. has had some significant health concerns including atopic dermatitis, allergic rhinitis, recurrent sinusitis, and asthma. Additionally, J.W. was recently diagnosed with a seizure disorder. J.W.'s health concerns require many prescription medications to properly treat them including, but not limited to, breathing treatments for the asthma, creams for skin problems, and oral medications.

According to the record, Ms. Whaley was hit by a car when she was a child and suffered a traumatic brain injury. Additionally, Ms. Whaley has a visual impairment for which she uses corrective lenses; though even with corrective lenses her vision remains significantly limited. Further, she has a seizure disorder; however, at the time of trial she had not had a seizure for six years.

On March 21, 1996, a Petition for Temporary Custody of J.W. was filed by the State of Tennessee Department of Children's Services (hereinafter referred to as "DCS") wherein DCS alleged that J.W. was a "dependent and neglected child" in that his mother, Ms. Whaley, was legally blind and physically unable to care for a three month old child. The Petition further stated that J.W. had been sick on several occasions, that he was not being fed properly, that Ms. Whaley was unable to determine the proper temperature for his bottle, and that she had had to call 911 for medical attention for the child. An Affidavit of Reasonable Efforts was filed on March 21, 1996, on behalf of DCS which presented the following questions and answers in pertinent part:

> 1. Why is removal necessary to protect this child? Mother is legally blind and physically unable to care for her child.
> 2. What are specific risks necessitating removal of the child? Mother and child would need twenty-four-hour supervision to insure safety and proper care of the child.
> 3. What specific services are necessary to allow the child to remain in the home or to be returned to the home? Updated psychological evaluation to determine extent of mom's mental and physical disabilities. Parenting assessment of her ability to parent now or in the future. Recommendations of how to assist her in

learning/exhibiting appropriate parenting skills.  Work with the State of Tennessee Blind Service.

A Protective Custody Order was entered by the Juvenile Court on March 21, 1996, finding that J.W. was a dependent neglected child and temporary care and custody was placed with the State of Tennessee, Department of Health, for Foster Care.

On April 2, 1996, a Plan of Care was entered into by DCS and Ms. Whaley.  There were five obligations/responsibilities which Ms. Whaley was to assume.  They are as follows:

> 1.  LaShondra will visit [J.W.] on a regular basis (at least four hours a month).
> 2.  LaShondra will inform DHS of a change in address or phone or anything else that is related to this plan.
> 3.  LaShondra will take her medication as prescribed and see her medical doctor as needed.
> 4.  LaShondra will work with the Blind Services for the visually impaired and take advantage of services and training this agency can offer.
> 5.  LaShondra will complete a neuropsychological evaluation and follow recommendations of the evaluations.

On August 30, 1996, an Order was entered ratifying the Foster Care Plan prepared by DCS.

A Progress Report was completed on December 3, 1996, regarding J.W.  The goal stated on the Plan of Care/Foster Care Plan was "reunification."  The following was stated with respect to Ms. Whaley and her progress:

> Mother attends weekly visitation with [J.W.].  Mother has completed video parenting classes at Life Challenge.  Mother keeps in touch with DCS.  Mother is working with Vocational Rehabilitation. Mother has contacted the unemployment office about getting a job. Father told DCS on 11/26/96 that he wants to surrender his parental rights.

The continued risk factors that were listed in the Report include:

> Mother has been missing appointments with the social worker from TN Blind Services.  (Thus missing out on opportunities to learn to cook, budget, and function independently despite her vision problems.)  Mother continues to allow a paramour who has hurt her and whom she has reported that she is afraid of to live in her home without the knowledge of the housing authority.  Mother goes off and

-3-

stays gone for several days at a time, thus causing problems with visitation which originally was set up to be supervised by family members who live close to mother. Worker frequently has phone conversations with mother when she sounds incoherent and her speech is slurred. Mother experienced a severe head injury at age 7 and suffers from organic dementia. She also experienced permanent optic nerve damage and is extremely near sighted (legally blind).

On January 28, 1997, an Order was entered awarding partial guardianship of J.W. to DCS, as James Hardy Brown, the biological father of J.W., voluntarily surrendered his parental rights to J.W. on January 6, 1997.

On May 20, 1997, another review was held and Ms. Whaley was in attendance. At that time DCS continued to state that the goal for permanency was for J.W. to return home to his mother. Further, the Report stated with respect to Ms. Whaley's compliance with the plan of care that "most tasks" were completed and that her progress toward reducing risks requiring placement in custody was "favorable." The report reflects that Ms. Whaley was attending weekly visitation, she had completed her parenting classes, she was keeping in touch with DCS, she was working with Vocational Rehabilitation and was on the waiting list to start the Bradley Developmental Center program.

Ms. Whaley's Risk Factors included most of those listed previously, such as the incoherent phone conversations, the head injury, the vision problem, and the fact that she takes Dilantin for seizures and Darvocet for headaches. The Report further stated that Dr. Hillner had completed a psycho-neurological test on Ms. Whaley but that he had not cooperated in releasing that information to DCS. Finally, the report stated, "It is felt by this worker that [J.W.] would be at risk for injury if he were left alone with his mother without supervision by another adult. DCS continues to supervise mother's visits for [J.W.'s] safety."

On August 13, 1997, a Progress Report was completed which stated that the goal in the Plan of Care was reunification and the projected date for the goal achievement was May 1, 1997. Additionally, the Report stated that J.W. has a small hole in his heart and is being monitored by a cardiologist at T.C. Thompson Children's Hospital. It further noted that J.W. has fetal dilantin syndrome and that he is developmentally delayed, has severe eczema, allergies, asthma and had tubes placed in his ears.

With respect to Ms. Whaley's progress the Report mirrored the May 20, 1997 Report with one exception; that Ms. Whaley visits with J.W. every week at the DCS office for an hour. Finally, regarding continued risk factors, the Report stated verbatim the language of the May 20, 1997, Report except for the first line concerning incoherent phone conversations, which was not included in this report.

The next Progress Report dated 2/17/98 stated that Ms. Whaley continued to have regular quality visits and that she was scheduled to begin vocational training within a week at Tennessee Vocational Rehabilitation in Smyrna. It further stated in the visitation summary that Ms. Whaley was faithful to visit with her son even though she had to walk to the visits. Ms. Whaley's continued risk factors were listed as needing to continue to have regular quality visits, needing a referral for a psychological evaluation and parenting skills evaluation and needing to complete her vocational training.

A further Progress Report completed on February 22, 1999, stated that there were some concerns with mother's ability to provide appropriate care for J.W.'s medical problems and behaviors because of her visual impairment. Under the "Family Functioning" heading the Report stated as follows:

> Ms. Whaley loves her child and visits regularly usually walking to the visit and arriving many times an hour to an hour and a half prior to the visit to make sure that she is there. There is no question that Ms. Whaley loves her child dearly and desires to do the best for him. However, because of her disabilities this may be impossible.

The Risk Factors set forth were stated as:

> 1. Ms. Whaley needs to complete her training at Voc. Rehab in Smyrna. 2. Ms. Whaley will have a parenting assessment by Dr. Hillner as soon as she completes the program in Smyrna and returns full time to the area. Future plans can be better determined after the receipt of the results of Dr. Hillner's assessment.

On August 17, 1999, DCS conducted a periodic review of Ms. Whaley and J.W. The permanency goal stated was for J.W. to return home. It was further stated that the need for foster care still existed, that DCS had completed its tasks with respect to compliance with the plan of care, and that Ms. Whaley had completed most tasks. Ms. Whaley's progress toward reducing risks requiring placement in custody was listed as "favorable." Barriers listed to achieving the desired outcome were "mother's medical and physical needs." Under "recommendations" DCS stated, "Mother have parent assessment by Dr. Hillner or another Dr. immediately and proceed with termination of parental rights if results are not positive."

Six months later, on February 15, 2000, another Progress Report was completed which stated as follows:

> LaShondra had a psychological evaluation completed by BRI on November 22, 1999. We had requested a parenting assessment. Dr. Biller indicated from his testing that LaShondra has limited cognitive

ability and her ability to care for the health of her infant son is very limited.

Under the heading, Family Functioning, DCS stated:

> LaShondra is a single, black, female that is in the mildly mentally retarded range of intellect. She is also severely visually impaired. Also, she has a limited cognitive ability, which impairs her ability to provide proper parental care of [J.W.] who has medical problems of his own and needs breathing treatment in times when his chronic asthma is active. LaShondra loves this child very much and desires to provide his care. LaShondra is very faithful to do whatever is requested of her.

There were two Risk Factors listed which included the need to have an additional assessment with Dr. Biller observing Ms. Whaley's interaction with J.W. and Ms. Whaley's need to complete vocational rehabilitation training. The recommendations made by DCS were that the present placement of J.W. be continued and to proceed with the termination of Ms. Whaley's parental rights, and that Dr. Biller complete his assessment within one month.

The Petition to Terminate Parental Rights filed on May 9, 2000, and the amended Petition filed on July 28, 2000, stated two statutory bases in support of the Petition, T.C.A. 36-1-113(g)(3)(A), and T.C.A. 36-1-113(g)(8)(B) and T.C.A. 36-1-113(g)(8)(C), which are as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
> . . .
>
> (3) (A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.
> . . .

(8)(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future, and

(ii) That termination of parental or guardian rights is in the best interest of the child.

(C) In the circumstances described under subdivisions (A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated.

On November 20, 2000, a hearing was held on the Petition to Terminate the parental rights of Ms. Whaley. The first witness called by DCS was Dr. Tom Biller, a psychologist who testified as an expert witness. Dr. Biller conducted a psychological evaluation of Ms. Whaley on November 22, 1999. Dr. Biller testified that Ms. Whaley had no diagnosis on the Axis I, and on Axis II she received two diagnoses. One was a mild mental retardation diagnosis as a result of the injuries she sustained in being struck by a car as a child and the other was paranoid personality disorder, which is, according to his testimony, "where an individual has a characteristic way of viewing the world as a threatening or hostile place." He further stated, "that individual has a tendency to be overly cautious and very guarded in the way that they respond to other people, and anticipate the worst in situations with others." On the Axis III, Dr. Biller listed Ms. Whaley's visual impairment and her seizure disorder. As for her Axis IV diagnosis, Dr. Biller listed "social problems and separation from family." Finally, Ms. Whaley received a 50/55 on her Axis V, GAF[1], which was "secondary to limited cognitive ability and paranoia." Dr. Biller testified that GAF 50/55 was within the moderate range in terms of security. When asked on direct examination about Ms. Whaley's cognitive ability, Dr. Biller stated the following:

Now, from a purely cognitive standpoint, an individual with limited intellectual ability can function in the same space through repetition, and training, and habit. But if that space or if that environment changes, the individual does not have the ability to adapt through changes and to make the subtle changes in behavior needed to meet a challenge of a new environment. They become very

---

[1] GAF is Global Assessment of Functioning, which, according to testimony by Dr. Biller, assesses one's ability to function.

determined functionally fixed. They are fixated a certain way of doing things, and if they have a change it really throws them for a loss.

And when you're dealing with children, the thing that we know about children is that they are change. And the environment which children live is an environment that is filled with change. And that makes it very difficult for someone with limited cognitive ability to work with the children, because it's so hard to have a consistent environment that does not change from moment to moment.

On cross-examination, Dr. Biller testified that Ms. Whaley was given two different series of tests which required visual responses. On neither test was any accommodation made for Ms. Whaley's visual impairment. Dr. Biller further testified that the responses given by Ms. Whaley indicated that she was able to see the designs on the cards well enough to make them out. The second visual test was a "hand test" that Ms. Whaley was given and she was also able to perform that test without any visual accommodations. Finally, with respect to Ms. Whaley's ability to care for her son, Dr. Biller responded as follows:

Q.      Okay. You conclude in your report that Ms. Whaley had a limited cognitive ability to care for her son and I think you testified about that. Was it true at this point that she couldn't care for her son?

A       [Dr. Biller] If she had 24/7 assistance. In other words, she would not be able to ever care for her son safely without assistance.

Q.      With assistance she might be able to?

A       [Dr. Biller] She would not do it the assistant would.

Q.      With assistance though?

A       [Dr. Biller] That's correct, with assistance.

Q.      I look at her ability to meet the immediate physical needs of the child. She isn't mean to her child, is she?

A       [Dr. Biller] Only from the standpoint that she has limited ability to meet the needs and may overlook dangers and problems that should be caught exactly.

The next person to testify was Ms. Mary Elliott, the home county case manager. Ms. Elliott testified that she had supervised and monitored some of the visitation between Ms. Whaley and her son. Ms. Elliott testified that there were times that Ms. Whaley would have to be encouraged to comfort J.W. when he was upset or crying. She further testified that when J.W. was much younger Ms. Whaley had to be reminded on several occasions to check his diaper. She testified to one incident when J.W. was having a "tantrum" and Ms. Elliott had to assist her with it. Additionally, Ms. Elliott stated, "[o]nce we got her in the habit of comforting him and showing her and reminding her and telling her to pick him up, you know, to hold him, you know, to rub his back, or you know,

to talk to him softly, tell him it was okay, that -- and she started doing that." When asked about family members or other persons willing to assist Ms. Whaley with her son, Ms. Elliott testified that, "LaShondra had indicated that there was a Margenia Makissit that was interested, but that was after we had filed a petition to terminate. And I explained to her at that point in time it was late in the game."

Following the testimony of Ms. Elliott, the guardian ad litem, Ms. Ginger Wilson, testified. On direct examination Ms. Wilson testified that she had had two contacts with J.W. during the four years and eight months J.W. had been in foster care. She testified that she saw him in 1996 at the DCS office and in October, 2000, and that she had never seen him with his mother. Ms. Wilson further testified that she had met with Ms. Whaley on two occasions, one in 1996 at Ms. Whaley's home and once in October, 2000. She recalled that she might have talked with Ms. Whaley on the phone and met with her at some other point. Ms. Wilson was asked on direct examination if she noticed any change in Ms. Whaley's ability to care for J.W. from the first visit in 1996 to the second visit in October, 2000. Ms. Wilson responded on direct exam as follows:

> A     [Ms. Wilson] I really did not see a change in LaShondra as far as the interaction and communication I had with LaShondra. When I met with her in 1996 it was in the context of her apartment and talking about [J.W.] and how to care for [J.W.]. And when I met with her in October of 2000 it was in my office, and we addressed the same subject of [J.W.] and how to care for [J.W.].
>
>        I don't think there has been really any change positively or negatively since 1996. I think basically the skills that she had in 1996, the reasoning that -- the responses to questions about caring for James are basically the same now as they were before.
>
> Q.     Do you think the child might be at risk if placed with her in her care?
>
> A     [Ms. Wilson] I think that is possible if placed with LaShondra in her care solely. The concern is her ability to care for the child. For instance, I specifically asked her in my office in October about caring for [J.W.] and if he needs medication "What should you do?" or "If he had yelled what would you do?" "I would call a nurse." "I would call the hospital." And never able to tell me what she could do to direct the immediate needs of the child.
>
> Q.     Do you think that the child might be at risk of harm were he able to be placed with her given his medical conditions?
>
> A     [Ms. Wilson] I think, yes. Because I don't think she fully, from the questions I asked her, understands his medical condition or what -- how to treat his medical condition if it

required her to take some action to address any -- like, if he had an asthma attack what she could do besides calling someone else to address those immediate problems that might arise.

Q. And would that be the same with the seizure disorder also?

A [Ms. Wilson] Yes.

Ms. Karen Buff, a vocational rehabilitation counselor for Services for the Blind testified that she had been working with Ms. Whaley for over two years. Ms. Buff testified that her job responsibilities include helping individuals to obtain employment and to enhance their quality of life. She further testified that Ms. Whaley had received counseling and guidance toward training for a professional goal and that Ms. Whaley had been fully cooperative with the program during her participation. She testified that Ms. Whaley attended the Tennessee Rehabilitation Program in Smyrna, Tennessee and that she successfully met the criteria for the Custodial Vocational Training Program and has obtained a cleaning job at the Bradley Mall. Ms. Buff testified that she still maintains contact with Ms. Whaley and continues to provide services such as transportation. When asked whether she believed Ms. Whaley was able to live independently Ms. Buff responded that she was able to. She further testified that she had been to Ms. Whaley's home and that everything appeared fine.

Finally, Ms. Margenia Makissit testified that she was a retired public school teacher and certified foster parent and that she has known Ms. Whaley all her life. Ms. Makissit testified that she attends church with Ms. Whaley every Sunday and that she has kept up with J.W. through Ms. Whaley but that she has never actually met him. Ms. Makissit testified that she has contact with Ms. Whaley once or twice each week and that they live in the same neighborhood. Ms. Makissit stated that she is willing to allow Ms. Whaley and J.W. to live in her home and assist Ms. Whaley in raising J.W. She further testified that she is fully aware of J.W.'s special needs as well as Ms. Whaley's limitations. Ms. Makissit also testified that she had spoken with Ms. Elliott in May or June of 2000 and told her she was willing to do whatever she could to help Ms. Whaley. On cross-examination, Ms. Makissit was asked whether she was willing to assume the financial responsibility of J.W. and she testified as follows:

A [Ms. Makissit] Financial responsibility? Now how do you mean that?

Q. You would probably have to pay for his care and his medicine.

A [Ms. Makissit] No, the only way that I would take this responsibility is through the Department of Human Services under supervision.

Q. So your idea is to leave him in our care legally and that you would be as a foster parent? Is that the idea?

A [Ms. Makissit] That would be the only way.

Q.      That would be the only way.  So that we would continue to cover him insurance wise and be the legal custodians, but you would be willing physically to take -- undertake his and LaShondra -- and have LaShondra move into your house with you?

A       [Ms. Makissit] Yes, I'm willing.

In the Order entered on February 28, 2001 terminating Ms. Whaley's parental rights, the Trial Court stated the following with respect to the termination:

> Based on the testimony, this Court finds that [J.W.] is a medically needy child who requires intensive care and monitoring.  This Court finds that when the father, surrendered his rights to this infant in late 1996 early 1997 this court addressed  its concerns to LaShondra Whaley about its concerns and the continuing medical problems of J.W.  It is now 4 years down the road and there is no meaningful relationship between the mother and the child.  Mrs. Whaley has done a remarkable job of achieving the goals of the permanency plan to the best of her ability and she has substantially complied with the permanency plan but the situation is still marginal.  However, the conditions that led to the removal continue to persist.  The child has medical problems that require at times immediate emergency help, someone must be there to administer life saving procedure to insure medical intervention.  These conditions have persisted for over 6 months (since August, 1996).  The conditions under reasonable probability will continue given the physical needs of this child thus the continuation of the parent child relationship prevents his safe return under Tennessee Code Annotated 36-1-113(g)(3)(A) in that the child has been removed from his mother for a period  longer than six (6) months (in this matter for 4 years) and the conditions continue to persist (T.C.A. 36-1-113(g)(3)(A)(i).  This is not through fault of the mother who has changed as much as possible but still cannot provide safe or appropriate supervision of this medically needy child.  Additionally under T.C.A. 36-1-113(g)(8)(B)(i) the parent is impaired and thus cannot provide a safe atmosphere for [J.W.].  The court finds that the requirement of T.C.A. 36-1-113(g)(8)(B)(i) is met.  The termination is in [J.W.'s] best interest.  Placing him with his mother might pose a risk to his psychological and physical well being.

We review the Trial Court's findings of fact *de novo* upon the record of the proceedings below,  with a presumption of correctness  "unless the preponderance of the evidence is otherwise."  Tenn. R. App. P. 13(d); *see also Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984).  There is no

presumption of correctness with regard to the Trial Court's conclusions of law, and those conclusions are reviewed *de novo*. *Jahn v. Jahn*, 932 S.W.2d 939 (Tenn. Ct. App. 1996).

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988)(citing *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988)(citing *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).

In order to terminate a parent's rights to his or her child, the trial court must make two findings. The court first must find, by clear and convincing evidence, that one of the asserted grounds for termination has been established. T.C.A. 36-1-113(c)(1). Once the court has made this finding, the court additionally must find that termination of a parent's rights is in the child's best interest. T.C.A. 36-1-113(c). Before a parent's rights may be terminated, there must first be a showing that the parent is unfit or substantial harm to the child will result if those rights are not terminated. *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999). Before the trial court may inquire as to whether the termination is in the best interests of the child, it must first determine that the grounds for termination have been established by clear and convincing evidence. T.C.A. 36-1-113(c). A court's findings by clear and convincing evidence that one or more of the statutory grounds for termination have been met and that it is in the best interest of the child to do so satisfy the requirement of showing that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated. This Court discussed the "clear and convincing evidence" standard in *O'Daniel v. Messier*, 905 S.W.2d 182 (Tenn. Ct. App. 1995), as follows:

> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn.Ct.App.1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer*, 455 U.S. at 766, 102 S.Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn.Ct.App.1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn.Ct.App.1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn.Crim.App.1987).
>
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. See *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn.Ct.App.1993); *Brandon v. Wright*, 838

S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn.Ct.App.1985).

*O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

In making the best-interest determination, the trial court is required to consider, *inter alia*, the following factors as codified in T.C.A. 36-1-113(i):

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward other children in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child;  or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by [DCS] pursuant to § 36-5-101.

A termination of parental rights may be based upon one of several statutory grounds as set forth in T.C.A. 36-1-113(g).  This Court has recognized that any one of these bases will support a termination of parental rights. See *In re C.W.W.*, 37 S.W.3d 467 (Tenn. Ct. App. 2000).  Our

-13-

Supreme Court has held that mental disability can be the basis for the termination of parental rights. *State v. Smith*, 785 S.W.2d 336 (Tenn. 1990). In the case *sub judice*, we must affirm the Trial Court's judgment terminating Ms. Whaley's parental rights if the record contains clear and convincing evidence to support even one of the bases found by the Trial Court. *In re C.W.W.*, 37 S.W.3d 467 (Tenn. Ct. App. 2000).

I.

The first issue on appeal questions whether there is clear and convincing evidence that Ms. Whaley's parental rights should be terminated. Ms. Whaley argues that the department's reliance upon T.C.A. 36-1-113(g)(3)(A) is misplaced. She admits that while her son has been removed from her custody for more than six months, the state has not carried its burden in proving by "clear and convincing" evidence that those conditions leading to the removal of J.W. still persist. Ms. Whaley argues that she has successfully completed parenting classes, she completed a rehabilitation program where she learned independent living skills, she has a home adequate for herself and her child, and she has become employed. Additionally, Ms. Whaley asserts that she has transportation available within the community, and she continues to work with Blind Services. Finally, Ms. Whaley submits that the issue of "early integration into a safe, stable and permanent home" is not an issue as DCS never made any effort to determine whether integration of J.W. back into her home was possible.

The State argues that Ms. Whaley failed to remedy the persistent conditions that have prevented the return of J.W. to her home. More specifically, the State asserts that Ms. Whaley failed to learn how to provide for J.W.'s special needs. Further, it maintains that Ms. Whaley's visual impairment and her mild mental retardation limit her ability to do anything other than simple tasks. The State relies on the testimony of Dr. Biller that Ms. Whaley is unable to care for her son without twenty-four hour assistance and that Ms. Whaley might overlook dangers and problems resulting from his medical conditions. The State also contends that Ms. Whaley's level of functioning has not improved since 1996 according to Dr. Biller and that there is little likelihood that these conditions will be remedied at an early date. Lastly, the State argues that continuation of the parent/child relationship greatly diminishes J.W.'s chances of early integration into a stable and permanent home and that in order for J.W. to be adopted, Ms. Whaley's rights must be terminated.

We agree with Ms. Whaley's argument that the State failed to show clear and convincing evidence that grounds for termination of parental rights exist. The State of Tennessee sets forth its first basis for termination, T.C.A. 36-1-113(g)(3)(A), which is that the child has been removed from the home of the parent by order of a court for a period of six months and the following:

> (i) The conditions which led to the child's removal or other conditions
> which in all reasonable probability would cause the child to be
> subjected to further abuse or neglect and which, therefore, prevent the
> child's safe return to the care of the parent(s) or guardian(s), still
> persist;
> (ii) There is little likelihood that these conditions will be remedied at

-14-

an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

While there is no question that J.W. has been removed from Ms. Whaley's home for a period of six months, the statute requires that the other three conditions be shown by clear and convincing evidence. First, the state must show that the conditions set forth in the initial petition for removal which led to J.W.'s removal or other conditions which in all reasonable probability would cause him to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent still persist. T.C.A. 36-1-113(g)(3)(A)(i). The initial petition for removal states that Ms. Whaley is legally blind, she is unable to care for J.W., she is having difficulty properly medicating him, she is having difficulty feeding J.W. properly, and that there were no family members willing or able to help her care for her child. The state has failed to show by clear and convincing evidence that these conditions still persist.

The evidence in the record is uncontroverted with respect to the fact that Ms. Whaley is visually impaired. However, this impairment has not prevented her from being somewhat self sufficient in that she has been living alone in an apartment for several years. Nor has it prevented her from fully complying with all the goals set forth by DCS. Her visual impairment did not prevent her from attending almost every visitation with her son for the past five years. It has not prevented her from walking to the visitation site for every visitation. It did not prevent her from completing vocational training in custodial services and from obtaining a job as a custodian at a local mall. Ms. Whaley is unable to obtain a license to operate a motor vehicle, however, she has access to transportation through services available to her in the community. Ms. Whaley was able to complete the visual aspects of the psychological evaluation given by Dr. Biller unassisted by visual accommodations. Additionally, she has been working with Blind Services to learn ways to adapt to her disability. Most importantly, the State has failed to show any evidence that Ms. Whaley's visual impairment has any impact on her ability to care for her son. The State has argued that the mere fact that the disability exists is sufficient evidence to prove that Ms. Whaley is unable to ever properly medicate J.W., yet there is no factual evidence to support such argument.

With respect to Ms. Whaley's inability to "properly care for her son" there is very little evidence in the record of that inability. Dr. Biller testified that during his evaluation of Ms. Whaley he conducted a clinical interview wherein he asked questions about her daily living skills, he performed the Rorschach Inkblot test which is a personality test, and he did a mental status evaluation. Additionally, he relied upon a psychological evaluation performed on October 25, 1996. Based upon the aforementioned, Dr. Biller testified that Ms. Whaley was diagnosed with paranoid personality disorder and he asserted that a person suffering from this disorder views the world as a threatening and hostile place and that that person would have a tendency to be overly cautious and very guarded in the manner in which they respond to other people. Further, Dr. Biller testified that he relied upon information obtained in1996 in concluding that her status of mental retardation had

-15-

continued and that he did not anticipate any improvement in the future. Dr. Biller further testified that because of her limited intellect, she would have difficulty doing things other than simple, elementary tasks. Finally, Dr. Biller testified that someone with limited cognitive ability, such as Ms. Whaley, can learn through repetition, training and habit. Dr. Biller's concern, however, was that children are constantly changing and, therefore, Ms. Whaley would be unable to adapt.

Dr. Biller's primary concern was Ms. Whaley's ability to care for a child with asthma. Ms. Whaley expressed during her interview with Dr. Biller that she did not know how to perform a breathing treatment because no one had ever taught her how to administer one. There is no evidence in the record that anyone ever attempted to teach Ms. Whaley how to properly medicate her son and that she was unable to do so. Most, if not all, of Dr. Biller's testimony with regard to Ms. Whaley's intellectual capacity, cognitive ability and visual impairment is uncontroverted. However, the State has failed to show how any of these problems actually do affect Ms. Whaley's ability to care for J.W.

The DCS records indicate that a Dr. Hillner completed a parenting assessment of Ms. Whaley in February, 1997, however, there continued to be DCS notes concerning the fact that the assessment still needed to be completed as late as August 17, 1999. There are also indications in the record that Dr. Hillner refused to release his results to DCS. It is unclear whether Ms. Whaley ever had any testing done by Dr. Hillner as the "parenting assessment" was again mentioned on a February 15, 2000, comment that Dr. Biller needed to observe Ms. Whaley with her son. There is nothing in the record to indicate that Dr. Biller ever completed this second assessment or that he ever observed Ms. Whaley and J.W. interacting. Further, the assessment was listed in DCS records on February 15, 2000, as an incomplete task. DCS mentioned every review that a parenting assessment needed to be completed, yet it does not appear that one was ever administered. Dr. Biller testified however, that the psychological evaluation he performed on Ms. Whaley was a "parenting assessment." It appears that DCS intended to have Ms. Whaley complete a parenting assessment, that a Dr. Hillner perhaps might have conducted such an assessment but would not release his results, and that DCS then decided that the psychological evaluation already performed by Dr. Biller was sufficient.

Regarding the testimony by Ginger Wilson, the guardian ad litem, that J.W. might "possibly" be at risk if he were placed with his mother, we find that nothing in her testimony establishes clear and convincing evidence of a grounds for termination. Ms. Wilson visited with Ms. Whaley only twice during a four and one-half year period. She met with J.W. only twice in a four and one-half year period. She never observed Ms. Whaley and J.W. interacting, nor did she observe whether Ms. Whaley had the ability to care for J.W., or medicate J.W. According to Ms. Wilson, she based her testimony and conclusions upon questions she asked Ms. Whaley about how she would care for J.W. For example, Ms. Wilson asked Ms. Whaley what she would do if J.W. needed medication and, according to her testimony, Ms. Whaley responded that she would call a nurse or doctor or the hospital. Ms. Wilson was concerned that Ms. Whaley was never able to express what she would do to actually help her child other than call someone else. This child was removed from Ms. Whaley when he was four months old. During the past four and one-half years Ms. Whaley has been restricted to four hours of supervised visitation with her son per month. We do not find Ms. Whaley's responses to these questions unreasonable considering the very limited exposure Ms.

Whaley has had to her son. It is not surprising that Ms. Whaley was unable to articulate how to react to certain medical emergencies or how to provide care for her child when she has never been in a position to actually do either. The mere fact that Ms. Whaley provided the aforementioned answers to Ms. Wilson's questions does not rise to the level of clear and convincing evidence that grounds for termination of her parental rights exist.

Ms. Elliott, the case manager, testified that initially the concern with Ms. Whaley was her inability to properly medicate J.W. Ms. Elliott further testified that the goal of having a Plan of Care is to eliminate the risk factors which brought the child into DCS custody and that even though Ms. Whaley did her very best in completing the goals, she was never able to eliminate those risks. Ms. Elliott also stated that she did not believe there was anything DCS could have done to that would enable Ms. Whaley to make her capable of caring for her child. Ms. Elliott testified about her observations of Ms. Whaley with her son. The problems she observed Ms. Whaley having with J.W. included Ms. Whaley not comforting her son, having to remind Ms. Whaley to check his diaper, becoming frustrated with a tantrum and not knowing how to react. It is our determination that the testimony of Ms. Elliott does not constitute clear and convincing evidence that Ms. Whaley is unable to care for her son. Further, Ms. Elliott testified that once Ms. Whaley was taught how to comfort her son, she was able to do so.

The State has put forth evidence that J.W. has bonded with his foster mother who intends to adopt him if Ms. Whaley's rights are terminated. J.W. was removed from his mother when he was four months old. Since that time, Ms. Whaley has been allowed no more than one hour of supervised visitation per week. According to testimony, J.W. had visitation in his mother's home once when he was an infant and never again. It is no surprise that J.W. has not bonded with Ms. Whaley considering the very limited amount of time she has been allowed to spend with him. It is a mystery to this Court as to why this mother, who has never harmed her child and does not pose any threat to him was never given an increase in visitation. There was no effort on the part of DCS for this child to be integrated back into his mother's home through increased visitation or attempts to teach Ms. Whaley how to give her son the appropriate amounts of medication. What we find even more disturbing is that Ms. Makissit, a retired school teacher and certified foster parent and neighbor to Ms.Whaley, contacted DCS one more than one occasion at least six months prior to the hearing on this matter offering her home to Ms. Whaley and J.W. and that the only response she received from DCS was that it was "too late." If nothing else, Ms. Makissit's home could have served as a place for Ms. Whaley to spend more time with her son under the supervision of Ms. Makissit.

Because DCS has failed to show clear and convincing evidence that the conditions which led to J.W.'s removal still persist, T.C.A. 36-1-113(g)(3)(A)(i), it is not necessary to address T.C.A. 36-1-113(g)(3)(A)(ii) and (iii).

The second factor DCS relied upon in petitioning to terminate Ms. Whaley's parental rights was T.C.A. 36-1-36-1-113(g)(8)(B), which states that it must be shown by clear and convincing evidence that the parent of the child is incompetent to adequately provide care and supervision because the parent's mental condition is so impaired and likely to remain so that it is unlikely that

the parent will be able to assume care and responsibility for the child in the future. While it is uncontroverted that Ms. Whaley has a low IQ and has been diagnosed as mildly mentally retarded, we find that the State has not proven by clear and convincing evidence that Ms. Whaley is incompetent to such a degree that she is unable to care for her child now or that she will be unable to care for him in the future. Ms. Whaley has managed to live alone and take care of herself for several years. She has attended almost every scheduled visitation with her son. When Ms. Whaley lived in Smyrna and was in vocational training she rode a Greyhound bus back to Cleveland every other weekend to visit with her son. She has been able to regulate and properly administer her own prescription medications. She has completed vocational training and has obtained a job. She is able to move about the community using public transportation. Ms. Whaley manages to get herself to work on the correct days and at the correct time as well as attending church every Sunday. Most importantly, Ms. Whaley has a friend who is a retired educator and foster parent willing to assist her in the parenting of her child. These factors negate the argument that Ms. Whaley is incompetent to provide care and supervision to a child.

The evidence presented by the State in this case is insufficient to abrogate the fundamental right of Ms. Whaley to the care, custody and control of her child. Because we reverse the Trial Court for the aforementioned reasons, the other issues Ms. Whaley raises on appeal are pretermitted.

For the foregoing reasons the judgment of the Trial Court is reversed and this cause is remanded to the Trial Court for further investigation into the possibility of placing J.W. and Ms. Whaley in the home of Ms. Makissit, or in the event that is not an option, to allow J. W. to remain in his current foster placement but to increase Ms. Whaley's visitation in a effort to integrate J.W. back into his mother's life. Costs of appeal as well as costs below are adjudged against the Appellee, State of Tennessee Department of Children's Services.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE

-18-